**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

ESTEBAN PALMA, individually and on behalf of all others similarly situated,

Plaintiff,

v.

FORMULA ONE DIGITAL MEDIA LIMITED,

Defendant.

Case No. 1:24-cv-5283-OEM-PK

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Hon. Orelia E. Merchant

Hon. Peggy Kuo

Dated: November 27, 2024

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Max S. Roberts
Victoria X. Zhou
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**PAGE**


NATURE OF THE ACTION ........ 1

FACTUAL BACKGROUND ........ 2

I. HISTORY AND OVERVIEW OF THE VPPA ........ 2

II. DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER ........ 3

III. DEFENDANT DISCLOSES CONSUMERS' PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES ........ 4

A. Testing Reveals That Defendant Illegally Shares Class Members' PII With Salesforce And Meta ........ 4

1. Overview Of The Salesforce API ........ 6

2. Overview Of The Meta Tracking Pixel ........ 7

B. Defendant Discloses Class Members' Email Addresses And User IDs To Salesforce ........ 9

C. Defendant Discloses Class Members' Facebook IDs To Meta ........ 10

D. Defendant Discloses Information Identifying Which Specific Videos Were Watched By Which Users To Salesforce And Meta ........ 12

1. Defendant Discloses The URLs Of Website Users' Watched Videos To Salesforce ........ 12

2. Defendant Discloses The Video Title And Video ID Of Videos Users Watch To Meta ........ 13

IV. DEFENDANT DISCLOSES CLASS MEMBERS' PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES FOR THE PURPOSE OF MARKETING, ADVERTISING, AND ANALYTICS ........ 14

A. Defendant Discloses Users' Personally Identifiable Information To Salesforce For The Purpose Of Marketing, Advertising, And Analytics ........ 15

B. Defendant Discloses Personally Identifiable Information To Meta For The Purpose Of Marketing, Advertising, And Analytics ....................16

V. DEFENDANT KNOWINGLY DISCLOSES CLASS MEMBERS' PII TO SALESFORCE AND META ....................18

VI. EXPERIENCE OF PLAINTIFF ....................19

THE PARTIES.................... 21

JURISDICTION AND VENUE .................... 21

CLASS ALLEGATIONS .................... 22

CAUSES OF ACTION .................... 24

PRAYER FOR RELIEF .................... 26

JURY TRIAL DEMANDED .................... 27

Plaintiff Esteban Palma ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action suit brought against Defendant Formula One Digital Media Limited ("Defendant" or "F1") for violating the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

2. The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

3. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710.

4. Defendant's paid Formula One TV subscription plans ("F1 TV" or the "F1 TV Service") allow users to "[w]atch every F1 session live or on demand, on your favorite device."[1] Defendant's paid subscription plans also provide users with access to "F1's pre- and post-race live shows, analysis, Tech Talks, documentaries and the official F1 archive"[2] on its f1tv.formula1.com website (the "Website").

[1] FORMULA ONE, https://www.formula1.com/en-us/subscribe-to-f1-tv.

[2] *Id.*

5. Unbeknownst to Plaintiff and Class Members, Defendant knowingly and intentionally discloses F1 TV users' personally identifiable information—including a record of every video viewed by the user—to unrelated third parties. By doing so, Defendant is violating the VPPA.

6. Plaintiff brings this action for damages and other legal and equitable remedies resulting from Defendant's violations of the VPPA.

## FACTUAL BACKGROUND

### I. HISTORY AND OVERVIEW OF THE VPPA

7. The impetus for the VPPA begins with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (1988) (cleaned up).

8. In 2012, Congress amended the VPPA, and in so doing, reiterated the VPPA's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

9. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

## II. DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER

10. F1 TV provides subscribers with content of live F1 sessions, other race series such as F2, F3, Porsche Super-cup, and F1 Academy, race replays, and highlights.[3] Subscribers have access to a "huge library of over 5,500 pieces of video content and [over] 1000 hours[] of full-race coverage"[4] including documentaries, expert analysis shows, and the F1 archive of races dating back to the 1970s.[5]

11. The F1 TV service offers two paid subscription plans: "F1 TV Pro" and "F1 TV Access."[6] Each requires a subscription fee—$84.99 per year and $29.99 per year, respectively.[7] To subscribe, individuals are required to create an account and provide first and last name, date of

---

[3] WHAT IS F1 TV, FORMULA ONE, https://support.formula1.com/s/article/2023-What-is-F1-TV?language=en_US.

[4] *F1 TV announces new features and confirms presenter line up for 2024*, FORMULA ONE (Feb. 22, 2024), https://corp.formula1.com/f1-tv-announces-new-features-and-confirms-presenter-line-up-for-2024/.

[5] WHAT IS F1 TV, FORMULA ONE, https://support.formula1.com/s/article/2023-What-is-F1-TV?language=en_US.

[6] *Id.*

[7] SUBSCRIBE, FORMULA ONE, https://www.formula1.com/en-us/subscribe-to-f1-tv.

birth, country of residence, and email address during the sign-up process.[8] Within a user's account, individuals can choose their preferred subscription type and complete the billing information to subscribe to Defendant's service.[9]

12. F1 TV launched in early 2018 and is available on the f1tv.formula1.com website as well as on the Google Play Store and iOS App Stores.[10] While detailed subscription figures for Defendant's Website users are not publicly available, approximately 7.9 million unique visitors accessed the Website in April 2024 alone.[11]

## III. DEFENDANT DISCLOSES CONSUMERS' PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES

### A. Testing Reveals That Defendant Illegally Shares Class Members' PII With Salesforce And Meta

13. Prior to the commencement of this action, Bursor & Fisher, P.A. retained a private research company to conduct a dynamic analysis of the Website. A "dynamic analysis" records the transmissions that occur from a user's device.

14. The private researchers tested what information (if any) Defendant discloses when a user watches a pre-recorded video on the F1 TV Website.

15. The analysis establishes that Defendant partners with at least two third party data analytics and services providers on the Website to build its online user base: Salesforce and Meta.

---

[8] CREATE ACCOUNT, FORMULA ONE, https://account.formula1.com/#/en/my-account.

[9] *Id*.

[10] *Formula 1 To Launch F1 Tv, A Live Grand Prix Subscription Service*, FORMULA ONE (Mar. 18, 2018), https://www.formula1.com/en/latest/article/formula-1-to-launch-f1-tv-a-live-grand-prix-subscription-service.5BmnYwhbaM86yeAe22sOmW. *See also* f1 tv, GOOGLE PLAY STORE, https://play.google.com/store/apps/details?id=com.formulaone.production&hl=en_US; F1 TV, APP STORE, https://apps.apple.com/us/app/f1-tv/id1315007279.

[11] F1 TV, SIMILARWEB, https://www.similarweb.com/website/f1tv.formula1.com/#overview.

Defendant integrates these third parties' "software development kits" ("SDK") and "application programming interfaces" ("API") into the Website.

16. An SDK is a "set of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[12]

17. An API "acts an intermediary layer that processes data transfer between systems, letting companies open their application data and functionality to external third-party developers [and] business partners."[13] An API can "work[] as a standalone solution or included within an SDK … [A]n SDK often contains at least one API."[14] APIs "enable[] companies to open up their applications' [or websites'] data and functionality to external third-party developers, business partners, and internal departments within their companies."[15]

18. The dynamic analysis found that when a Website user creates an account and watches a pre-recorded video on the Website, Defendant discloses the following information to Salesforce and Meta:

---

[12] API VS. SDK: THE DIFFERENCE EXPLAINED (WITH EXAMPLES), https://getstream.io/glossary/api-vs-sdk/.

[13] IBM, *What is an API?*, available https://www.ibm.com/topics/api.

[14] SDK VS. API: WHAT'S THE DIFFERENCE?, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface).

[15] APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

| THIRD PARTY | VIDEO INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| **Evergage (Salesforce)** | Video Title, Video ID, Video URL, Video Events | Email (plain) | User ID |
| **Meta (Facebook)** | Video Title, Video ID | - | FBP, Facebook ID* |

*for logged in users

*1. Overview Of The Salesforce API*

19. Salesforce advertises itself as "the world's #1 AI customer relationship management (CRM) platform."[16]

20. In February of 2020, Salesforce acquired Evergage, which it renamed as the Salesforce Marketing Cloud Personalization (the "Salesforce SDK") and incorporated into the Salesforce Marketing Cloud suite of products.[17] The Salesforce API allows companies like Defendant to "visualize, track, and manage customer experiences with real-time interaction management."[18] Salesforce describes the Salesforce API as a "technology solution that ingests customer engagement and profile data, then — using machine learning and AI — determines relevant messages, segmentation, and content for each customer, based on their preferences and affinities."[19]

21. When clients, like Defendant, integrate the software into a website, they can gather real-time data about customers to better understand "each visitor by building a centralized

---

[16] WELCOME TO SALESFORCE INVESTOR RELATIONS, https://investor.salesforce.com/overview/default.aspx?utm_cta=website-data-warehouse-for-dummies-confirmation#.

[17] *See* PR NEWSWIRE, https://www.prnewswire.com/news-releases/salesforce-acquires-evergage-will-use-personalization-to-enhance-customer-data-and-deliver-more-relevant-experiences-301000691.html (last visited July 15, 2024).

[18] *Customer Lifecycle Engagement With Real-Time Interaction Management*, SALESFORCE, https://www.salesforce.com/video/7825550/.

[19] PERSONALIZATION, SALESFORCE, https://www.salesforce.com/marketing/personalization/.

individual profile from different data sources."[20] The Salesforce API enables clients to "tailor[] interactions with customers and prospects, increase loyalty, engagement, and conversions [and] deliver more relevant experiences during interactions across the customer journey."[21]

22. Website developers like Defendant integrate the Salesforce API into their websites. Once integrated, the Salesforce API uses a "JavaScript beacon to manage the flow of data between the Personalization platform and the SDK libraries used in the client integration."[22] "When a user accesses [the] website, the JavaScript beacon places a first-party cookie on the user's browser, which sends data for that user back to Salesforce through the Salesforce API. This data includes pages visited, links clicked, time on the site, the number of visits, geolocation, and the referral source, as well as other custom data [the client] want[s] to collect."[23]

*2. Overview Of The Meta Tracking Pixel*

23. The Meta Tracking Pixel is a piece of code that Meta's clients, like Defendant, can integrate into their website. Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[24]

24. When the Meta Tracking Pixel captures an action, it sends a record to Meta. Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like Custom Audiences and Core Audiences.

---

[20] INTRODUCTION TO PERSONALIZATION, SALESFORCE, https://help.salesforce.com/s/articleView?id=sf.mc_pers_intro.htm&type=5.

[21] *Id.*

[22] WEB SITE PERSONALIZATION, SALESFORCE, https://help.salesforce.com/s/articleView?id=sf.mc_pers_web_sdk_integration.htm&type=5.

[23] *Id.*

[24] RETARGETING, META, https://www.facebook.com/business/goals/retargeting.

25. Clients such as Defendant can also build "Custom Audiences."[25] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website." With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[26]

26. Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta. Advertisers can do this through two mechanisms: (i) by manually uploading contact information for customers; or (ii) by utilizing Meta's "Business Tools," which collect and transmit the data automatically.[27] One such Business Tool is the Meta Tracking Pixel.

27. Defendant can control what user actions—or, as Meta calls it, "events"—the Meta Tracking Pixel will collect. The Meta Tracking Pixel can capture the website's metadata, along with what pages a visitor views and what buttons a visitor clicks.[28] Defendant can also configure the Meta Tracking Pixel to track other events. Meta offers a menu of "standard events" from which

---

[25] ABOUT CUSTOM AUDIENCES, META, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[26] ABOUT LOOKALIKE AUDIENCES, META, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[27] CREATE A CUSTOMER LIST CUSTOM AUDIENCE, META, https://www.facebook.com/business/help/170456843145568?id=2469097953376494.

[28] *See* ACCURATE EVENT TRACKING, META, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* BEST PRACTICES FOR META PIXEL SETUP, META, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

advertisers like Defendant can choose, including what content a visitor views or purchases.[29] Defendant can also create its own tracking parameters by building a "custom event."[30]

28. Website developers like Defendant control how the Meta Tracking Pixel identifies Website visitors. The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[31] HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[32] Pixel-specific data includes "the Pixel ID and cookie."[33]

**B. Defendant Discloses Class Members' Email Addresses And User IDs To Salesforce**

29. The dynamic analysis demonstrated that Defendant shared Website users' email addresses and user IDs to Salesforce via the Salesforce API.

30. An email address is a unique string of characters that designates an electronic mailbox. As industry leaders,[34] trade groups,[35] and courts[36] agree, an ordinary person can use an

---

[29] SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, META, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[30] ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, META, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[31] META PIXEL, META, https://developers.facebook.com/docs/facebook-pixel/.

[32] *Id.*

[33] *Id.*

[34] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[35] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2020), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[36] *See United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

email address to uniquely identify another individual. Indeed, there exists multiple services that enable anyone with internet access and a credit card to look up who owns a particular email address.

31. The following excerpt from the dynamic analysis shows Defendant disclosing a user's email address to Salesforce when a user watches a pre-recorded video on the F1 TV Website:

Subscribed","userType":"Registered","emailAddress":"blimal
amamama@gmail.com"},"id":"205753307","anonId":"db7e72b8ec8

32. The dynamic analysis also recorded Defendant transmitting Website users' User IDs to Salesforce through the Salesforce API. A user ID is a unique string of numbers which Defendant assigns to an individual user after a user creates an F1 TV account. The unique user IDs allow Defendant to identify and track an individual user.

33. The following excerpted dynamic analysis captures Defendant disclosing a Website user's unique user ID—identified as "'id' : '205753307'" in this particular example—to Salesforce through the Salesforce API. This unique user ID was assigned to the same Website user's email address, making it apparent that Defendant assigns a unique F1 TV user ID to each user once an individual user creates their own F1 TV account.

Subscribed","userType":"Registered","emailAddress":"blimal
amamama@gmail.com"},"id":"205753307","anonId":"db7e72b8ec8

**C. Defendant Discloses Class Members' Facebook IDs To Meta**

34. Defendant discloses to Meta through the Meta Tracking Pixel F1 users' Facebook ID in combination with specific names of video content viewed by those users.

35. The Facebook ID is a unique and persistent identifier that Facebook assigns to each user. Anyone who possesses a Facebook ID may use this number to quickly and easily locate, access, and view the corresponding Facebook profile by simply visiting www.facebook.com/[the user's Facebook ID].

36. Facebook profiles contain large amounts of personal information. A Facebook profile typically shows the Facebook user's name, gender, place of residence, career, educational history, a multitude of photos, and the content of the user's posts. This information may reveal even more sensitive personal information—for instance, posted photos may disclose the identity of family members, and written posts may disclose religious preferences, political affiliations, personal interests and more.

37. When a user of the Website user who is logged into Facebook watches a video, its Universal Resource Locator ("URL") and title are transmitted to Meta alongside their Facebook ID, thereby revealing which video content the specific individual viewed:

```
fbp: fb.1.1714509146542.531878558
```

38. In the above excerpt from the dynamic analysis, the string of numbers highlighted in pink as "fb.1.1714509146542.531878558" corresponds to the user's Facebook ID.

39. Just as Meta can easily identify any individual on its Facebook platform with only their unique Facebook ID, so too can any ordinary person who comes into possession of a Facebook ID. Facebook admits to this capability on its website.[37] Thus, equipped with a Facebook ID and the video content title and URL—all of which Defendant knowingly provide to Meta without VPPA-compliant consent from its subscribers—an ordinary person could determine the identity of the unique F1 TV subscriber and the specific video content they viewed on the Website.

40. Through use of the Meta Tracking Pixel, Defendant discloses to Meta the full name and URL of each video a user watched, together with the user's Facebook ID, thus linking users' viewing content choices and preferences to their Facebook profiles. In other words, this single

---

[37] *See* YOUR USERNAME, META, https://www.facebook.com/help/1740158369563165.

transmission connects a user's video content with their Facebook ID.

41. Defendant violates and invades the privacy rights of Website users by disclosing users' Facebook IDs, together with their viewing content, to Meta. Plaintiff neither knew of, authorized, nor otherwise consented to Defendant's disclosures of the prerecorded videos they watched and other personally identifying information to Meta.

**D. Defendant Discloses Information Identifying Which Specific Videos Were Watched By Which Users To Salesforce And Meta**

42. When Defendant transmits a user's identifiers, it also transmits information sufficient to identify which specific video was watched by the user, such as the video name, video ID, and video URL.

*1. Defendant Discloses The URLs Of Website Users' Watched Videos To Salesforce*

43. Defendant also discloses to Salesforce through the Salesforce API the video URL that a user watches.


```
  event: {"action":"Viewed Content Videos","itemAction"
:null,"source":{"pageType":"formula1_content_videos","cont
entZones":["f1_newsletter_global_popup","f1_fantasy_global
_popup","f1_tv_pre-season_global_popup","f1_tv_free-trial_
global_popup"],"url":"https://www.formula1.com/en/latest/v
ideo.onboard-max-verstappens-2024-pirelli-pole-position-aw
ard-lap-at-the-chinese-grand-prix.1796848033052131475.html
```


44. A video's URL, once entered into an Internet search browser, will take the person directly to the webpage containing the video that the Website user watched. The following screenshot shows the disclosed URL searched on the Internet, which subsequently lead to the webpage containing the disclosed video:




45. Further, Defendant and Salesforce both can see whether a user actually viewed a video. In the screenshot of the disclosed network transmissions above, the "event" parameter clarifies that the user actually watched the video: it says "action: Viewed Content Videos."

*2. Defendant Discloses The Video Title And Video ID Of Videos Users Watch To Meta*

46. Defendant discloses to Meta via the Meta Tracking Pixel the title and video ID of the video a user viewed on the Website. For example, the following excerpted dynamic analysis shows the traffic captured by the dynamic analysis of the Website. The video title of the video the user watched is "Jolyon Palmer's Analysis: Stroll's Shanghai Slam | Workday." The video ID of the video the user watched is "1290508261050914."

```
  cd[pageFeatures]: {"title":"\"Jolyon Palmer's Analysis:
Stroll's Shanghai Slam | Workday\""}
```

```
id: 1290508261050914
```

47. As shown above, Defendant discloses to Meta the F1 TV video ID of the video an individual user watches: "1290508261050914." This unique identification number correlates to the specific video a user watches and allows Defendant and Meta to further link the exact video a user watches with the user's PII. This, in turn, allows Defendant to use that information in Defendant's marketing, analytics, and advertising processes.

48. Given that every prerecorded video on F1 TV has a corresponding video ID, Defendant provides Meta with backend tools to match a video's unique ID to a video's title so that Meta can help Defendant enhance its marketing and advertising efforts.

49. Further, disclosing a video's full title allows even an ordinary person to easily locate the watched video. For example, in the screenshot below the disclosed video title was searched on a search engine in conjunction with "F1 TV", and the first result on Google was the video that the user watched.




## IV. DEFENDANT DISCLOSES CLASS MEMBERS' PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES FOR THE PURPOSE OF MARKETING, ADVERTISING, AND ANALYTICS

50. Defendant discloses personally identifiable information to Meta and Salesforce so they can help Defendant with marketing, advertising, and analytics.

51. As alleged above, both the Salesforce APIs and the Meta Tracking Pixel are designed to analyze App data and marketing campaigns, conduct targeted advertising, and

ultimately boost Defendant's revenue from its video-based marketing and advertising on the Website.

### A. Defendant Discloses Users' Personally Identifiable Information To Salesforce For The Purpose Of Marketing, Advertising, And Analytics

52. Defendant discloses a user's PII including email address and video-viewing information in the form of video URL and User ID to Salesforce via the Salesforce API so that Salesforce can "optimize [Defendant's] offerings by creating a more individualized customer experience."[38]

53. Through Salesforce's Personalization platform and the Salesforce API, Defendant isable to analyze its customers with the Website integration that provides "functions, properties, and methods to track user behavior on [the] website and send that behavioral data to Personalization, enabling [them] to build user or visitor behavior profiles."[39]

54. Further, Defendant advertises its partnership with Salesforce on its website, stating: "Formula 1 will use the power of Salesforce Customer 360 to wow its global fanbase with insights that drive a deeper understanding of fans and inform behaviours, communication, and actions with them as they engage with the sport."[40]

---

[38] MARKETING, SALESFORCE, https://www.salesforce.com/marketing/personalization/guide/.

[39] PERSONALIZATION, SALESFORCE, https://developer.salesforce.com/docs/marketing/personalization/guide/web-integration.html.

[40] PARTNERS, F1, https://corp.formula1.com/partners/salesforce/.




55. Salesforce's partnership with Formula 1 enables Defendant to share collected data with their Marketing Cloud Advertising software,[41] that "helps [] target [] digital advertising campaigns across multiple platforms [(i.e., Facebook, Instagram, Google Ads, LinkedIn, X (Twitter), Pinterest, and Snapchat)] with Advertising Audiences."[42]

56. Defendant utilizes Salesforce's comprehensive array of tracking and analytics tools to optimize its marketing, advertising, and analytics—ultimately increasing its viewer base and subscription revenue.

**B. Defendant Discloses Personally Identifiable Information To Meta For The Purpose Of Marketing, Advertising, And Analytics**

57. Defendant discloses a user's PII including email address, Facebook ID and video-viewing information in the form of video title and video ID to Meta via the Meta Tracking Pixel

[41] INTEGRATE PERSONALIZATION WITH ADVERTISING, SALESFORCE, https://help.salesforce.com/s/articleView?id=sf.mc_pers_salesforce_marketing_cloud_advertising.htm&type=5.

[42] ADVERTISING AUDIENCES, SALESFORCE, https://help.salesforce.com/s/articleView?id=sf.mc_ads_advertising_audiences.htm&type=5.

so that Meta can "personali[ze] content, tailor[] and measur[e] ads, and provid[e] a safer experience" for Website users.[43]

58. The Meta Tracking Pixel allows Defendant "to track [its] website visitors' actions," which Meta calls conversion tracking.[44] "Tracked conversions … can be used to analyze [Defendant's] return on ad investment."[45]

59. Notably, "[e]ach time the Pixel loads, it automatically … track[s]" and records the URL that a Website user viewed.[46] In other words, so long as Defendant has installed the Meta Tracking Pixel onto f1tv.com, anyone who views that webpage—meaning all Website users—"will be tracked using that" automatic URL tracker.[47] And, as mentioned above, the tracked URL discloses to Meta the exact video(s) that a Website user views. Indeed, Meta even warns advertisers such as Defendant to "make sure" the Website URLs are specific enough that Defendant "can define visitor actions exclusively based on unique … website URLs."[48]

60. "Once tracked, custom conversions"—such as the URL tracking tool—"can be used to optimize [Defendant's] ad campaigns"[49] through other Meta tools such as Ads Insights.[50]

---

[43] COOKIES POLICY, META, https://www.facebook.com/privacy/policies/cookies/?entry_point=cookie_policy_redirect&entry=0.

[44] CONVERSION TRACKING, META, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.

[45] *Id.*

[46] CUSTOM CONVERSIONS, META, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking#custom-conversions.

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] CUSTOM CONVERSIONS INSIGHTS, META, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking#custom-conversions.

61. Defendant utilizes Meta's comprehensive array of tracking and analytics tools to optimize its marketing, advertising, and analytics—ultimately increasing its viewer base and subscription revenue.

## V. DEFENDANT KNOWINGLY DISCLOSES CLASS MEMBERS' PII TO SALESFORCE AND META

62. Based on the above, it is abundantly clear that Defendant *intentionally* and *knowingly* discloses to F1 TV users' personally identifiable information and video-viewing information to Salesforce and Meta.

63. *First*, as outlined above, Defendant openly partners with Salesforce to gain "a richer understanding of fan data" and accordingly "drive a deeper understanding of fans."[51]

64. Indeed, Salesforce partnered with Defendant in a "multi-year contract" that will gives Defendant a "richer understanding of fan data."[52] Defendant will accomplish this by "leveraging the technology and expertise from Salesforce['s suite of technological tools]."[53]

65. Brandon Snow, the Managing Director at Formula One, stated in 2022 that Formula One was looking forward to "[u]sing [Salesforce's] industry-leading technology products … to improve the experience for the fans and [the] insight we have to tailor our approach even better."[54]

66. *Second*, Defendant admits in its Privacy Policy (which is not "a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" under 18 U.S.C. § 2710(b)(2)(B)(i)) that F1 TV "may share your information with our group companies,

[51] GLOBAL PARTNER, FORMULA ONE, https://corp.formula1.com/partners/salesforce/.

[52] *Salesforce to Revolutionize Formula 1's Fan Engagement and Accelerate its Sustainability Efforts with 5-year Partnership*, SALESFORCE (Apr. 5, 2022), https://www.salesforce.com/news/press-releases/2022/04/05/salesforce-and-formula-1/.

[53] *Id.*

[54] *Id.*

law enforcement agencies, service providers, partners, people who operate of take over our Digital Products and third parties that you agree that we can share it with."[55] Defendant claim that it

> [c]ollect[s] [your] data to operate effectively and provide you the best experiences with our products. You provide some of this data directly, such as when you create an account or contact us for support. We get some of it by recording how you interact with our products by, for example, using technologies like cookies – this may collect data about your use of our Digital Products, your device(s) and your location.[56]

67. Further, Defendant delineates how F1 TV "may use your Information… in connection with targeting/advertising activities."[57]

68. *Finally*, common sense dictates that sophisticated media industry leaders like Defendant—who integrated the Salesforce and Meta APIs precisely for its marketing, advertising, and analytics capabilities—are fully aware of the scope of the data that Salesforce and Meta collect. Indeed, Defendant would need to contract with Salesforce and Meta specifically for their marketing, advertising, and analytics services in order for the technologies here at issue to be implemented into the F1 TV Service.

69. Therefore, Defendant knowingly and intentionally provides personal information and video-viewing information to Segment for marketing, advertising, and analytics services.

## VI. EXPERIENCE OF PLAINTIFF

70. Plaintiff Esteban Palma is a resident and citizen of New York. In or around February 2023, Plaintiff Palma created and paid for an F1 TV account. Shortly thereafter, Plaintiff Palma used the Formula One Website and his paid F1 TV account to watch various videos,

---

[55] PRIVACY POLICY, FORMULA 1, https://account.formula1.com/#/en/privacy-policy.

[56] *Id.*

[57] *Id.*

including pre-recorded videos. Plaintiff Palma last watched a pre-recorded video on the Website using his F1 TV account in approximately July 2024.

71. On at least several occasions in February 2023, March 2023, and July 2023, Plaintiff Palma watched a pre-recorded video on the Formula One Website while signed into both his paid F1 TV account and his Facebook account, on the same Internet browser.

72. By subscribing to and paying for the F1 TV Service, Plaintiff Palma received access to watch exclusive F1 TV live and pre-recorded videos, in addition to other benefits.

73. At all relevant times, Plaintiff Palma never consented to, agreed to, or otherwise permitted Defendant to disclose his PII and video-viewing information to third parties, including Salesforce and Meta, "in a form distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b)(2)(B)(i).

74. Likewise, Defendant never gave Plaintiff Palma the opportunity to prevent the disclosure of his PII and video-viewing to third parties, including Salesforce and Meta, "in a form distinct and separate from any form setting forth other legal or financial obligations," and where Plaintiff Palma was provided with the "opportunity, in a clear and conspicuous manner … to withdraw on a case-by-case basis or to withdraw from ongoing disclosures." 18 U.S.C. § 2710(b)(2)(B)(iii).

75. Nevertheless, each time Plaintiff Palma viewed a pre-recorded video on the F1 TV Website, Defendant disclosed Plaintiff Palma's PII and video-viewing information to Salesforce and Meta via the Salesforce API and the Meta Tracking Pixel, respectively. Specifically, Defendant disclosed Plaintiff Palma's: (i) email address, (ii) Facebook ID, (iii) user ID, and (iv) video information, including video title, video ID, and video URL.

76. Using this information, Salesforce and Meta were able to identify Plaintiff Palma

and attribute his video viewing records to an individualized profile of Plaintiff Palma. Indeed, even an ordinary person could identify Plaintiff Palma using the data Defendant disclosed to Salesforce and Meta. Salesforce and Meta compiled Plaintiff Palma's PII and activity on the F1 TV Website (including video-viewing information), which Defendant used and continues to use for marketing, advertising, and analytics purposes.

## THE PARTIES

77. Plaintiff Esteban Palma is, and has been at all relevant times, a resident of New York and has an intent to remain there, and is therefore a citizen of New York.

78. Defendant Formula One Digital Media Limited is an English and Wales corporation with company number 08915039 and registered office at No. 2 St. James's Market, London, SW1Y 4AH. Defendant Formula One Digital Media Limited owns and operates the F1 TV Website, which is used throughout the State of New York and the United States.

## JURISDICTION AND VENUE

79. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

80. This Court also has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

81. This Court has personal jurisdiction over Defendant because Defendant specifically and knowingly targeted New York residents by providing the Website's services to residents of New York. Further, as a foreign corporation, Defendant may be sued in any state pursuant to Fed. R. Civ. P. 4(k)(1) by virtue of Defendant's significant and pervasive contacts with the United

States, including but not limited to Defendant's collection of subscriber revenue from paid F1 TV account holders located in the United States and Defendant's collection of PII and video-viewing information from F1 TV account holders located in the United States.

82. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the claim occurred in this District. Further, as a foreign corporation, Defendant may be sued in any judicial district. 28 U.S.C. § 1391(c)(3).

## CLASS ALLEGATIONS

83. **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who either created an account on formula1.com and/or subscribed to the F1 TV Service, watched pre-recorded videos on the Website, and subsequently had their PII transmitted to a third party during the applicable statute of limitations period (the "Class").

84. Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

85. **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiff do not know the exact number of members of the aforementioned Class. However, given the popularity F1 TV, the number of Class Members is believed to be so numerous that joinder of all members is impractical.

86. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

(a) whether Defendant collected Plaintiff's and Class Members' PII;

(b) whether Defendant unlawfully disclosed and continue to disclose F1 TV users' PII, including their video viewing records, in violation of the VPPA;

(c) whether Defendant's disclosures were committed knowingly; and

(d) whether Defendant disclosed Plaintiff's and Class Members' PII without consent.

87. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, watched videos on F1 TV (specifically, the Website) while signed into their F1 TV accounts and had their PII and video-viewing information disclosed by Defendant to third parties, including Salesforce and Meta.

88. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff are able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class. Plaintiff has raised viable statutory claims, of the type reasonably expected to be raised by members of the Class, and Plaintiff will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

89. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Even if every member of the Class could

afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiff anticipate no difficulty in the management of this case as a class action.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VPPA
### 18 U.S.C. § 2710

90. Plaintiff incorporate the foregoing allegations as if fully set forth herein.

91. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

92. Defendant is a "video tape service provider" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as Defendant provides videos (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via the F1 TV Service.

93. Plaintiff and Class Members are "consumers" as defined by the VPPA because they created F1 TV accounts with their personal information such as first and last name, date of birth, country, and e-mail address, paid for their subscriptions, obtained access to exclusive video content

as a result, and subsequently watched pre-recorded videos through those accounts on the F1 TV Website. 18 U.S.C. § 2710(a)(1).

94. That is, through signing up for a F1 TV account, the purpose of which is to provide live and pre-recorded video content to subscribers, Plaintiff and Class Members provided payment and personal information which was then used to track them without their VPPA-compliant consent. In exchange, Plaintiff and Class Members received F1 TV benefits including exclusive access to video content in exchange. Under the VPPA, therefore, Plaintiff and Class Members were "subscriber[s]" of "goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

95. Plaintiff and Class Members viewed pre-recorded videos on the F1 TV Website. During these occasions, Defendant disclosed Plaintiff's and Class Members' PII to third parties including Meta and Salesforce. Specifically, Defendant disclosed Plaintiff's and Class Members': (i) email address, (ii) Facebook ID, (iii) user ID; and (iv) video information, including video title, video ID, and video URL.

96. The information that Defendant disclosed to Salesforce and Meta through the Salesforce API and the Meta Tracking Pixel, respectively, constitutes "knowing[] disclosures" of Plaintiff and Class Members' "personally identifiable information" as proscribed by the VPPA. 18 U.S.C. § 2710(a)(1). Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The definition's usage of the word "includes" means that a more expansive reading of the term was expressly contemplated. Indeed, the information disclosed by Defendant to Salesforce and Meta enables even an ordinary person to identify which specific videos were watched by Plaintiff or specific Class Members.

97. Plaintiff and Class Members did not provide Defendant with consent to disclose their PII and video-viewing information to third parties, including, Salesforce and Meta, "in a form distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b)(2)(B)(i). Nor were Plaintiff and Class Members given the opportunity to prevent the disclosure of their PII and video-viewing to third parties, including Salesforce and Meta, "in a form distinct and separate from any form setting forth other legal or financial obligations," and where Plaintiff and Class Members were provided with the "opportunity, in a clear and conspicuous manner … to withdraw on a case-by-case basis or to withdraw from ongoing disclosures." 18 U.S.C. § 2710(b)(2)(B)(iii).

98. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Salesforce and Meta were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

99. On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendant, on behalf of himself and all others similarly situated, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated: November 27, 2024

Respectfully submitted,

By: *<u>/s/ Yitzchak Kopel</u>*
Yitzchak Kopel

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Max S. Roberts
Victoria X. Zhou
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

*Attorneys for Plaintiff*